## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:   HEALTH DIAGNOSTIC LABORATORY, INC., *et al*.,<br><br>Debtors.[1] | Case No.: 15-32919-KRH<br>Chapter 11 (Jointly Administered) |

---

| | |
|---|---|
| RICHARD ARROWSMITH AS LIQUIDATING TRUSTEE OF THE HDL LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTIAN LIFE ASSEMBLY OF COLUMBIA, SOUTH CAROLINA, INC., d/b/a CHRISTIAN LIFE CHURCH and SOUTH CAROLINA SCHOOL OF LEADERSHIP,<br><br>Defendant. | Adv. Pro. No. 22-03020-KRH |

---

| | |
|---|---|
| RICHARD ARROWSMITH AS LIQUIDATING TRUSTEE OF THE HDL LIQUIDATING TRUST,<br><br>Plaintiff,<br><br>v.<br><br>LAKE MURRAY BAPTIST CHURCH,<br><br>Defendant. | Adv. Pro. No. 22-03036-KRH |

---

## <u>MEMORANDUM OPINION</u>

---

[1]   The debtors in these jointly administered cases (these "Chapter 11 Cases") are Health Diagnostic Laboratory, Inc., Central Medical Laboratory, LLC, and Integrated Health Leaders, LLC (collectively, the "Debtors" or "HDL").

On April 8, 2022, Richard Arrowsmith, in his capacity as the Liquidating Trustee of the HDL Liquidating Trust (the "Liquidating Trustee"),[2] filed a *Complaint to Recover Avoidable Transfers* against Christian Life Assembly of Columbia, South Carolina, Inc., d/b/a Christian Life Church and the South Carolina School of Leadership ("CLC") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court").  Compl. to Recover Avoidable Transfers, Adv. Pro. No. 22-03020, ECF No. 1, as amended at ECF No. 18.  On May 9, 2022, the Liquidating Trustee filed a similar complaint in this Court against Lake Murray Baptist Church ("LMBC," and together with CLC, the "Defendants").  Compl. to Recover Avoidable Transfers, Adv. Pro No. 22-03036, ECF No. 1, as amended at ECF No. 19.[3]

The Complaints filed by the Liquidating Trustee seek to recover funds under section 550(a) of Title 11 of the United States Code (the "Bankruptcy Code") that the Liquidating Trustee claims were fraudulently transferred from the Debtors' bankruptcy estate (the "Bankruptcy Estate") to Floyd Calhoun Dent, III ("Dent") and BlueWave Healthcare Consultants, Inc. ("BlueWave"), and then were transferred by Dent and BlueWave to CLC and LMBC.  The Liquidating Trustee maintains that by employing commonly accepted forensic methodologies, he can trace $1,149,900 of the Debtors' fraudulently transferred funds into CLC and that he can trace $238,512 of the Debtors' fraudulently transferred funds into LMBC.  The Defendants have denied each of the

---

[2]   The Liquidating Trustee was appointed by the Modified Liquidating Trust Agreement [*In re Health Diagnostic Lab'y*, Case No. 15-32919 (Bankr. E.D. Va. Mar. 25, 2016), ECF No. 999] and pursuant to the *Modified Second Amended Plan of Liquidation Proposed by the Debtors* (the "Plan") attached as Appendix A to the *Order Confirming Debtors' Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* [*In re Health Diagnostic Lab'y, Inc.*, Case No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1095] (the "Confirmation Order") entered in these Chapter 11 Cases.  *See infra* at 5-6.

[3]   The *Complaint to Recover Avoidable Transfers* filed in Adversary Proceeding No. 22-03020 and the *Complaint to Recover Avoidable Transfers* filed in Adversary Proceeding No. 22-03036 are hereinafter referred to as the "Complaints" and the adversary proceedings that were commenced by the two Complaints are hereinafter referred to as the "Adversary Proceedings."

Liquidating Trustee's relevant allegations.  Def. CLC's Answer to Am. Compl. to Recover Avoidable Transfers, Adv. Pro. No. 22-03020, ECF No. 21; Def. LMBC's Answer to Am. Compl. to Recover Avoidable Transfers, Adv. Pro. No. 22-03036, ECF No. 21.  As the legal arguments presented by counsel for the Liquidating Trustee and by counsel for the Defendants were substantially similar, the parties agreed to conduct the trials in these two Adversary Proceedings concurrently on March 12 and 13, 2024 (the "Trial").[4]

Although the facts underlying these Chapter 11 Cases have been well documented in the litigation that has ensued throughout the Fourth Circuit since HDL's business imploded in 2015, s*ee, e.g.*, *United States v. Mallory*, 988 F.3d 730 (4th Cir. 2021); *Arrowsmith v. Warnick* (*In re Health Diagnostic Lab'y, Inc.*), Adv. Pro. No. 17-04300, 2018 WL 4676339, 2018 Bankr. LEXIS 2953 (Bankr. E.D. Va. Sept. 27, 2018); *United States ex rel. Lutz v. Berkeley HeartLab, Inc.*, Civil Action No. 9:14-230-RMG, 2017 WL 5033652, 2017 U.S. Dist. LEXIS 179876 (D.S.C. Oct. 31, 2017), the parties were not able to stipulate to many of the pertinent facts giving rise to the instant proceedings.  *See* Joint Stipulation of Fact, Adv. Pro. No. 22-03020, ECF No. 86 [hereinafter *Joint Stip.*].  Based on the evidence presented by the parties at Trial, the record in these Adversary Proceedings now before the Court, the record in the underlying Chapter 11 Cases, and the record in the associated adversary proceedings arising in the Chapter 11 Cases, the Court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.[5]

---

[4]   The only material factual distinction that emerged in the evidence presented at Trial in these two Adversary Proceedings related to the amounts and the sources of the fraudulently transferred funds from the initial transferees to the Defendants.  Throughout this Opinion, the Court cites to the docket in Adversary Proceeding No. 22-03020 exclusively unless citation to Adversary Proceeding No. 22-03036 is necessary to clarify a factual distinction.

[5]   Pursuant to Federal Rule of Evidence 201, the Court takes judicial notice of the docket and papers filed in these Adversary Proceedings, these Chapter 11 Cases, and the other associated adversary proceedings.

**Jurisdiction**

The Court has subject matter jurisdiction over these Adversary Proceedings under 28 U.S.C. §§ 157 and 1334(b) and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. Each Adversary Proceeding is a constitutionally core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O), because the cause of action brought by the Liquidating Trustee is a proceeding "arising in" these Chapter 11 Cases under Title 11. *See Stern v. Marshall*, 564 U.S. 462, 474 (2011) (Bankruptcy courts "may hear and enter final judgments in 'all core proceedings arising under title 11, or arising in a case under title 11.'" (quoting 28 U.S.C. § 157(b)(1))). Venue is appropriate pursuant to 28 U.S.C. § 1409(a).

**Factual Background**

HDL was formed as a start-up laboratory in Richmond, Virginia, offering a panel of blood tests for early detection of cardiovascular disease, diabetes, and related illnesses. Proposed Findings of Fact & Conclusions of Law at 6, Adv. Pro. No. 16-03271 (Bankr. E.D. Va. May 24, 2021), ECF No. 1461 at 6 [hereinafter *PFFCL*].[6] Dent was a shareholder of HDL and a principal and insider of HDL's exclusive sales agent and marketing consultant, BlueWave. *Id.* at 6 n.13, 7, Adv. Pro. No. 16-03271, ECF No. 1461 at 6 n.13, 7. Pursuant to a *Sales Agreement* executed between HDL and BlueWave (the "BlueWave Agreement"), HDL paid commissions to BlueWave from 2010 through 2014 totaling more than $220 million. *Id.* at 8 & n.15, Adv. Pro. No. 16-03271, ECF No. 1461 at 8 & n.15. A substantial portion of these commissions was subsequently

---

[6]    The District Court for the Eastern District of Virginia (the "District Court") adopted the Court's PFFCL in full. *Arrowsmith v. Mallory* (*In re Health Diagnostic Lab'y, Inc.*), Case No. 3:17-cv-400-HEH, 2021 WL 4099012, at *4, 2021 U.S. Dist. LEXIS 170582, at *12 (E.D. Va. Sep. 8, 2021); Joint Stip. ¶ 1, Adv. Pro. No. 22-03020, ECF No. 86 at 2; Joint Stip. ¶ 1, Adv. Pro. No. 22 03036, ECF No. 89 at 2. The Defendants do not contest the underlying facts contained in the PFFCL. Joint Stip. ¶ 1, Adv. Pro. No. 22-03020, ECF No. 86 at 2; Joint Stip. ¶ 1, Adv. Pro. No. 22 03036, ECF No. 89 at 2.

transferred to Dent and the Dent Entities,[7] one of which was HisWay of South Carolina, Inc.

("HisWay"). *Id.* at 3 n.5, 8, Adv. Pro. No. 16-03271, ECF No. 1461 at 3 n.5, 8.

In or around 2012, the U.S. Department of Justice (the "DOJ") began investigating whether

the business practices set forth in the BlueWave Agreement violated the federal Anti-Kickback

Statute, 42 U.S.C. § 1320a-7b. *Id.* at 8, Adv. Pro. No. 16-03271, ECF No. 1461 at 8. In 2015,

BlueWave terminated the BlueWave Agreement.[8] *Id.* at 9, Adv. Pro. No. 16-03271, ECF No. 1461

at 9. HDL and the DOJ entered into a settlement agreement resolving the DOJ's allegations later

that same year. *Id.* Shortly thereafter on June 7, 2015, HDL filed a voluntary petition for relief

under Chapter 11 of the Bankruptcy Code.[9] Voluntary Pet. for Relief, *In re Health Diagnostic*

*Lab'y*, Case No. 15-32919 (Bankr. E.D. Va. Jun. 7, 2015), ECF No. 1. This Court confirmed the

Plan, by its Confirmation Order entered May 12, 2016. The Plan became effective the same day.

Notice of: (I) Entry of Order Confirming Second Am. Plan of Liquidation Proposed by the

---

[7]   *See* PFFCL 3 n.5, Adv. Pro. No. 16-03271 (Bankr. E.D. Va. May 24, 2021), ECF No. 1461 at 3 n.5 (defining "Dent Entities" to include HisWay of South Carolina, Inc.; Cobalt Healthcare Consultants Inc.; AROC Enterprises LLC; Riverland Pines LLC; Crosspoint Properties LLC; Helm-Station Investments LLP; Lakelin Pines LLC; Trini D Island LLC; CAE Properties LLC; Royal Blue Medical Inc.; Blue Eagle Farm, LLC; and Forse Medical Inc.); *id.* at 6 n.13, Adv. Pro. No. 16-03271, ECF No. 1461 at 6 n.13 ("Dent . . . formed the Dent Entities, which are owned by Dent and various members of his family.").

[8]   The DOJ investigation was not the only legal battle in which HDL and BlueWave were embroiled. Between 2011 and 2013, three *qui tam* actions were filed in the United States District Court for the District of South Carolina (the "South Carolina District Court") against BlueWave and Dent, among others, alleging that the commissions paid by the Debtors to BlueWave violated the federal Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b. and the federal False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-3733. *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 494 (D.S.C. 2016). The United States intervened in the qui tam action in 2015. *Id.* Following a twelve-day trial, a unanimous jury found Dent liable for 35,074 false claims for services performed by HDL for which Medicare and TRICARE paid $16,601,591. *See United States ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.*, Civil Action No. 9:14-cv-00230-RMG, 2018 WL 11282049, at *1, 2018 U.S. Dist. LEXIS 119203, at *5 (D.S.C. May 23, 2018), *aff'd sub nom. United States v. Mallory*, 988 F.3d 730 (4th Cir. 2021). After trebling the damages and imposing civil penalties in accordance with the FCA, the South Carolina District Court entered judgment against Dent, in the amount of $111,109,655.30 for these claims. *Id.* at *8, 2018 U.S. Dist. LEXIS 119203, at *25. Finding that "the Government provided sufficient evidence to show that the commissions violated the [AKS] and accordingly the [FCA]," the Fourth Circuit affirmed the judgment on February 22, 2021. *See Mallory*, 988 F.3d at 736 n.1, 743.

[9]   On June 9, 2015, this Court entered an order which provided for the joint administration of the Debtors' Chapter 11 Cases. *In re Health Diagnostic Lab'y, Inc.*, Case No. 15-32919 (Bankr. E.D. Va. Jun. 9, 2015), ECF No. 42.

Debtors; (II) Occurrence of Effective Date; & (III) Deadline for Filing Admin. Expense Claims, Fee Claims, & Claims Arising from Rejection of Executory Contracts or Unexpired Leases, *In re Health Diagnostic Lab'y, Inc.*, Case No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1097.

The Plan substantively consolidated the Debtors' bankruptcy estates and created the Liquidating Trust, a grantor trust, for the benefit of holders of allowed general unsecured claims, subordinated claims, and interests of HDL.  *See* Plan §§ 1.66, 1.69, 5.1-5.3, *In re Health Diagnostic Lab'y*, Case No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1095 at 60, 61, 72.  Richard Arrowsmith was appointed as the Liquidating Trustee responsible for administering the Liquidating Trust in accordance with a Liquidating Trust Agreement.  *Id.* § 1.74, *In re Health Diagnostic Lab'y*, Case No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1095 at 62.  The Plan vested all property of the consolidated Debtors' bankruptcy estates, including litigation claims, in the Liquidating Trust.  *Id.* § 6.5(h), *In re Health Diagnostic Lab'y*, Case No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1095 at 85.  The Liquidating Trust became "the successor of the Debtors . . . for all purposes."  Plan §§ 6.5(c)(23), (e), *In re Health Diagnostic Lab'y*, Case No. 15-32919 (Bankr. E.D. Va. May 12, 2016), ECF No. 1095 at 83, 84; Modified Liquidating Tr. Agreement ¶ 4.1(w), *In re Health Diagnostic Lab'y*, Case No. 15-32919 (Bankr. E.D. Va. Mar. 25, 2016), ECF No. 999 at 12.

The Liquidating Trustee filed an amended complaint on August 17, 2017, which sought to avoid and recover certain fraudulent transfers under sections 547, 548, and 550 of the Bankruptcy Code against the former shareholders and insiders of the Debtors, including BlueWave, Dent, and HisWay, among others.  *See* First Am. Compl., *Arrowsmith v. Mallory*, Adv. Pro. No. 16-03271 (Bankr. E.D. Va. Aug. 17, 2017), ECF No. 375 [the foregoing adversary proceeding, hereinafter

*BlueWave Litigation*].  After the Fourth Circuit affirmed that the payment scheme set out in the

BlueWave Agreement violated the FCA, *Mallory*, 988 F.3d at 734, the District Court adopted this

Court's findings that the BlueWave Agreement was void as a matter of law and, therefore, that the

Debtors "received no legally-recognizable value from the illegal and unenforceable BlueWave

Agreement," *Arrowsmith v. Mallory* (*In re Health Diagnostic Lab'y, Inc.*), Case No. 3:17-cv-400-

HRH, 2021 WL 4099012, at *3, 2021 U.S. Dist. LEXIS 170582, at *9 (E.D. Va. Sep. 8, 2021).

As the transfers that the Debtors had made to Dent, the Dent Entities, and BlueWave were made

without value, they were avoided as fraudulent transfers under sections 548(b) and 544(b) of the

Bankruptcy Code, the latter utilizing 28 U.S.C. §§ 3001-3008.[10]  *Id.* at *3-4, 2021 U.S. Dist.

LEXIS 170582, at *9-10, *12.  The Liquidating Trustee obtained a now final and unappealable

judgment in the BlueWave Litigation allowing him to recover the $220,336,247.91 in funds that

BlueWave had received from the Debtors and the $770,661.00 in funds that Dent had received

from the Debtors (collectively, the "Avoided Transfers").  *See* Order Granting Pl.'s Mot. to Direct

Entry of a Final J. by Consent of the Parties 2, *Arrowsmith v. Mallory*, Case No. 3:17-cv-00400-

HEH (E.D. Va. Oct. 18, 2021), ECF No. 33 [hereinafter *BlueWave Summary Judgment Order*].

The Liquidating Trustee subsequently initiated a series of adversary proceedings against

entities believed to have received proceeds of the Avoided Transfers (the "Subsequent Transfers")

as direct or indirect transferees of Dent and/or BlueWave.  During the course of investigating such

claims, the Liquidating Trustee became aware that Dent had made substantial transfers of property

to non-profit or religious institutions, including the Defendants in these Adversary Proceedings,

either directly or through HisWay.  In particular, from November 2011 to December 2013, Dent

---

[10]    On those bases, the Liquidating Trustee successfully obtained summary judgment against Dent and BlueWave.
*Mallory*, 2021 WL 4099012, at *4, 2021 U.S. Dist. LEXIS 170582, at *11-12.

donated $1,355,900 to CLC, Joint Stip. ¶ 2, Adv. Pro. No. 22-03020, ECF No. 86 at 2, and from August 2013 to October 2018, Dent donated $375,876 to LMBC, Joint Stip. ¶ 2, Adv. Pro. No. 22-03036, ECF No. 89 at 2 (the foregoing, collectively, the "Donations").[11]   Neither CLC nor LMBC had any knowledge of the BlueWave Litigation or that they were the recipients of the Avoided Transfers.  *See* Joint Stip. ¶ 6, Adv. Pro. No. 22-03020, ECF No. 86 at 3; Joint Stip. ¶ 6, Adv. Pro. No. 22-03036, ECF No. 89 at 3.

Section 550(a) provides that "to the extent that a transfer is avoided under sections 544, 545, 547, 548, 549, 553(b), or 724(a) of [the Bankruptcy Code], the trustee may recover, for the benefit of the estate, the property transferred . . . from the initial transferee of such transfer . . . or any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).[12]  This section of the Bankruptcy Code creates a mechanism by which the bankruptcy estate can be returned to the position in which it would have been but for the avoided transfer.  *Tavenner v. Smoot* (*In re Smoot*), 265 B.R. 128, 139 (Bankr. E.D. Va. 1999) (citing *Aero-Fastener, Inc. v. Sierracin Corp.* (*In re Aero-Fastener, Inc.*), 177 B.R. 120, 139 (Bankr. D. Mass. 1994)) ("The intent [of section 550] is to restore the estate to the financial condition it would have enjoyed had the transfer not occurred."); *see also Anderson v. Bennett-Smith* (*In re Bennett*), Adv. Pro. No. 20-02012, 2021

---

[11]   The Defendants did not contest that they gave no value in exchange for the Donations.  In fact, the Parties stipulated that the Defendants received the Donations from Dent in the nature of tithes and offerings.  Joint Stip. ¶ 3, Adv. Pro. No. 22-03020, ECF No. 86 at 2; Joint Stip. ¶ 3, Adv. Pro. No. 22 03036, ECF No. 89 at 2; *see also Arrowsmith v. First United Methodist Church Ctr., Ala.* (*In re Health Diagnostic Lab., Inc.*), No. 22-03023-KRH, 2023 WL 7457002, at *8, 2023 Bankr. LEXIS 2721, at *18 (Bankr. E.D. Va. Nov. 9, 2023) ("[T]he Defendant asserted that the value Johnson received was the intangible emotional benefits of charitable giving. . . . [V]alue under section 550(b) requires the receipt of a quantifiable economic benefit.  Positive, altruistic feelings are not value for purposes of section 550 of the Bankruptcy Code.").

[12]   The Bankruptcy Code does not define the term "initial transferee," so this Circuit applies a "dominion and control" test to determine whether the transferee had (1) "legal dominion and control over the property" and (2) the ability to "exercise this legal dominion and control."  *AVI Guttman v. Constr. Program Grp.* (*In re Railworks Corp.*), 760 F.3d 398, 403 (4th Cir. 2014) (first citing *Grayson Consulting, Inc. v. Wachovia Sec., LLC* (*In re Derivium Cap. LLC*), 716 F.3d 355, 362 (4th Cir. 2013); then citing *Bowers v. Atlanta Motor Speedway* (*In re Se. Hotel Props. Ltd. P'ship.*), 99 F.3d 151, 155 (4th Cir. 1996)).

WL 666339, at *3, 2021 Bankr. LEXIS 381, at *8 (Bankr. M.D.N.C. Feb. 19, 2021); *Bargeski v. Rose,* No. 05-0962, 2006 WL 1238742, at *6, 2006 U.S. Dist. LEXIS 29059, at *20 (D. Md. Mar. 30, 2006), *aff'd,* 242 F. App'x 945 (4th Cir. 2007) (per curiam).

### Procedural History

*1.*    *The Defendants' Motion to Dismiss under the Religious Liberty and Charitable Donation Protection Act of 1998*

The Defendants moved to dismiss the Complaints, claiming that the Religious Liberty and Charitable Donation Protection Act of 1998, Pub. L. No. 105-183, 112 Stat. 517 (codified, in part, at 11 U.S.C. §§ 544, 548) [sections 544(b) and 548(a)(2) of the Bankruptcy Code hereinafter, and collectively, *Charitable Contributions Exception*], protected the Defendants from any liability for the receipt of fraudulent transfers.  Mot. to Dismiss for Failure to State a Claim upon Which Relief Can Be Granted, Pursuant to Fed. R. Civ. P. 12(b)(6), ECF No. 5; Br. in Supp. of Def.'s Mot. to Dismiss at ¶ 1, ECF No. 5-1 [hereinafter, and collectively, *Motion to Dismiss*].

The Court found the Defendants' argument that the Charitable Contributions Exception shields them from liability to be without merit.  The interpretation of sections 548(a)(2) and 544(b)(2) of the Bankruptcy Code advanced by the Defendants would require the Court to improperly expand the sole exception provided in section 550 of the Bankruptcy Code, which exception Congress explicitly limited.  *See Law v. Siegel*, 571 U.S. 415, 421 ("[I]n exercising [its] statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions.").  Although this appears to be an issue of first impression, it is not a complicated one: the defenses available to a defendant under section 548 of the Bankruptcy Code are not available to a defendant under section 550 of the Bankruptcy Code.

The Court's "interpretation of the Bankruptcy Code starts where all such inquiries must begin: with the language of the statute itself."  *Ransom v. FIA Card Servs., N.A*., 562 U.S. 61, 69

(2011) (internal citation omitted).  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations and quotations omitted); *see also Wadsworth v. Word of Life Christian Ctr.* (*In re McGough*), 737 F.3d 1268, 1273 (10th Cir. 2013).  When the statute is unambiguous, "resort to legislative history" is improper. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 186-87 & n.8 (2004).

The Religious Liberty and Charitable Donation Protection Act of 1998 (the "Donations Protection Act") amended the Bankruptcy Code in several ways:

> First, the Act amended sections 544 and 548 so as to insulate from a trustee's avoidance powers certain charitable contributions to qualified religious and charitable entities.  Second, the Act amended section 707(b) to restrict a court from considering the debtor's charitable giving in making determinations of dismissal for substantial abuse.  Third, the Act amended section 1325 to allow certain charitable contribution expenses in the calculation of a debtor's disposable income.

*McLaney v. Ky. Higher Educ. Assistance Auth.* (*In re McLaney*), 314 B.R. 228, 235-36 (Bankr. M.D. Ala. 2004).

The Donations Protection Act added the "Charitable Contributions Exception" to section 548 of the Bankruptcy Code.  Generally, section 548 permits the trustee, inter alia, to avoid "any transfer . . . of an interest of the debtor in property . . . if the *debtor* voluntarily or involuntarily . . . received less than reasonably equivalent value in exchange for such transfer . . . ." 11 U.S.C. § 548(a)(1)(B) (emphasis added).  "The Charitable Contributions Exception provides that "[a] transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B)." *Id.* § 548(a)(2).  The Charitable Contributions Exception in section 548 of the Bankruptcy Code requires that the "charitable

contribution" be made by the debtor, and it also requires that the debtor be a natural person. *Id.* § 548(d)(3). Section 544(b)(2) of the Bankruptcy Code incorporates the Charitable Contribution Exception from section 548 as an exception to the trustee's ability to "*avoid* any transfer of an interest of the *debtor* in property . . . that is voidable under applicable law by a creditor holding an unsecured claim." *Id.* § 544(b) (emphasis added). Not inconspicuously, the Donations Protection Act did not amend section 550 of the Bankruptcy Code.

Section 550 of the Bankruptcy Code provides its own limited defense to a cause of action brought thereunder. Section 550(a) of the Bankruptcy Code states, "[e]xcept as otherwise provided *in this section* . . . the trustee may recover . . . the property transferred." *Id.* § 550(a) (emphasis added). The Charitable Contributions Exception is not "provided in this section."[13] Congress explicitly limited the one exception it did provide to "transferee[s] that take for value, . . .in good faith, and without knowledge of the voidability of the transfer avoided." *Id.* § 550(b)(1). The Defendants cannot avail themselves of the exception because neither of them took the donations they received for value.

By excepting any defense other than the single defense it did provide to liability in section 550(a), Congress specifically intended for the section 550(b) defense it enumerated to be exclusive. "When a federal statute enumerates defenses to liability, without specifying that other

---

[13]    The Defendants argued that because section 550(a) of the Bankruptcy Code refers to transfers avoided under sections 544 and 548 of the Bankruptcy Code, the Charitable Contributions Exception necessarily applies to a recovery action under section 550 of the Bankruptcy Code. But the BlueWave Summary Judgment Order that found and established the Avoided Transfers did not implicate the Charitable Contributions Exception. *See generally Mallory*, 2021 WL 4099012, 2021 U.S. Dist. LEXIS 170582. Congress enacted section 550 of the Bankruptcy Code with full knowledge of section 548(a)(2) of the Bankruptcy Code. And Congress included within subsection (b) of section 550 of the Bankruptcy Code a statutory defense to the recovery action. This indicates that Congress intended to provide a defense to transferees of avoided transfers. But the inclusion of this single defense also indicates that Congress chose not to extend the Charitable Contributions Exception to situations where the transferee has received proceeds of an *already* avoided transfer, even if that transferee is otherwise a qualified religious or charitable institution.

unenumerated defenses are available, the enumerated statutory defenses are generally deemed to be the exclusive defenses available under the statute." *Arrowsmith v. First United Methodist Church Ctr., Ala.* (*In re Health Diagnostic Lab., Inc.*), No. 22-03023-KRH, 2023 WL 7457002, at *9, 2023 Bankr. LEXIS 2721, at *21-22 (Bankr. E.D. Va. Nov. 9, 2023) (quoting *United States v. Barlow*, 576 F. Supp. 2d 1375, 1381-82 (S.D. Fla. 2008)). "Where the Bankruptcy Code has enumerated a defense, a bankruptcy court cannot create a new defense not otherwise provided when that defense would contradict the Code." *Id*. (citing *McColley v. M. Fabrikant & Sons, Inc.* (*In re Candor Diamond Corp.*), 26 B.R. 850, 851-52 (Bankr. S.D.N.Y. 1983)). As such, this Court cannot expand the statutory defense Congress included in section 550 to an action brought thereunder to encompass the Charitable Contribution Exception.

Applying the Charitable Contributions Exception to an action under section 550(a) of the Bankruptcy Code would contradict the Bankruptcy Code in other ways as well. The Charitable Contributions Exception applies only when an *individual debtor* donates funds to a qualified religious or charitable entity. "Charitable contributions" as used in section 548(a)(2) is defined to mean a contribution "made by a natural person." 11 U.S.C. § 548(d)(3)(A); *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 484 (Bankr. S.D. N.Y. 2015) ("The defense is available only to a qualified religious organization that receives a charitable contribution from an individual debtor." (internal citations omitted)). As the Charitable Contribution Exception is limited to individual debtors only, it would not apply to a donation made by a corporate debtor, nor would it apply to a donation made by a non-debtor.

Here, the Subsequent Transfers to the Defendants were made by either Dent or HisWay. As a corporation, HisWay is not an individual. While Dent is a natural person, Dent is not a debtor. Neither is HisWay. So even if section 548(a)(2) of the Bankruptcy Code applied to a section 550

action under the Defendants' tortured interpretation—which it does not—the Defendants still could not claim the Charitable Contributions Exception because neither of the transferors (i.e., Dent, as a non-debtor, and HisWay, as a non-debtor and not a natural person) satisfies the statutory requirements imposed by section 548(a)(2) of the Bankruptcy Code.

Regardless of this unambiguous language, the Defendants assert that such an interpretation of the Charitable Contributions Exception must be in error as it would lead to absurd results. "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947 (2000)). "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *Lynch v. Jackson*, 853 F.3d 116, 122 (4th Cir. 2017). But

> a statutory interpretation that produces surprising or anomalous results is not the same as one producing *absurd* results. Indeed, to "truly be characterized as absurd," the interpretation of a statute must result in an outcome "that is so gross as to shock the general moral or common sense." Thus, an interpretation of a statute that produces "plausible" results cannot violate the absurd-result rule of statutory construction.

*Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) (emphasis in original) (quoting *Sigmon Coal Co., Inc. v. Apfel*, 226 F.3d 291, 304, 308 (4th Cir. 2000)); *see also Resolution Tr. Corp. v. Westgate Partners, Ltd.*, 937 F.2d 526, 529 (10th Cir. 1991) ("[S]o long as Congress remains faithful to the Constitution, it is free to enact any number of foolish statutes. It is only where a plain language interpretation would lead to an outcome so 'absurd' that Congress clearly could not

have intended such an outcome, that we will employ the 'absurdity' exception in order to avoid the harsh result.").

Allowing the trustee of a bankruptcy estate to recover proceeds of avoided and avoidable transfers from initial, immediate, and mediate transferees, even where such transferees are qualified charitable or religious institutions, is not "absurd." Section 550(a) of the Bankruptcy Code expressly allows such a result. Although this may put a charitable or religious institution in a difficult position, "Congress undoubtedly considered the equitable ramifications of permitting recovery from a subsequent transferee, and only carved out a defense for a transferee who has taken in good faith and for value." *First United Methodist Church Centre, Ala.*, 2023 WL 7457002, at *9, 2023 Bankr. LEXIS 2721, at *20-21; *see In re Se. Hotel Props. Ltd. P'ship*, 99 F.3d at 157 (noting in the context of recovery of post-petition transfers that "[t]here is almost always some injustice or hardship . . . because the loss must fall either upon the third person or upon the creditors of the bankrupt. Whether the line which has been drawn is the best possible solution of the problem is not for the courts to say." (quoting *Lake v. N.Y. Life Ins. Co*., 218 F.2d 394, 399 (4th Cir. 1955))); *Richardson v. United States* (*In re Anton Noll, Inc.*), 277 B.R. 875, 882 (B.A.P. 1st Cir. 2002) ("Congress has 'made its own judgment of who should bear the risk of loss in enacting § 550.'" (quoting *Rupp v. Markgraf*, 95 F.3d 936, 944 (10th Cir. 1996))). Congress was aware of section 550(a) of the Bankruptcy Code when it enacted the Donations Protection Act. The fact that Congress chose not to include the Charitable Contributions Exception as a defense enumerated in section 550 of the Bankruptcy Code speaks further to the fact that allowing the Liquidating Trustee to recover against the Defendants is not an absurd result.

For the foregoing reasons, the Court denied the Defendants' Motion to Dismiss the Complaints.

2.      *The Liquidating Trustee's Motion to Exclude the Defendants' Supplemental Expert Report*

On the eve of trial, the Liquidating Trustee objected to admission of the Supplemental

Report of Stephen D. Kirkland, CPA, CMC, CFF [ECF No. 68-2] (the "Supplemental Kirkland

Report"). The Supplemental Kirkland Report had not previously been disclosed to the Liquidating

Trustee. The existence of a Supplemental Kirkland Report was identified for the first time in the

Defendants' final pretrial disclosures, Def.'s Witness & Ex. Lists 3, ECF No. 58 at 3 [hereinafter

*Final Pretrial Disclosures*], which were required to be made by February 6, 2024,[14] Pretrial Disc.

Scheduling Order ¶ 6, ECF No. 20 at 3. The Defendants inexplicably missed this filing deadline

by thirteen days.[15] Even then, the Final Pretrial Disclosures did not include a copy or provide a

description of the Supplemental Kirkland Report. Def.'s Witness & Ex. Lists, ECF No. 58. Only

when the Defendants included the Supplemental Kirkland Report among their exhibits filed with

the Court on February 26, 2024, (as required by the *Pretrial Discovery Scheduling Order* [ECF

No. 20]), did the Liquidating Trustee have access, for the first time, to a copy of the Supplemental

Kirkland Report. Liquidating Trustee's Objs. to Def.'s Exs. § 1, ECF No. 81 at 3-6. No excuse

was provided to the Court for the Defendants' unquestionable failure to timely file their Final

Pretrial Disclosures.

"If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not

allowed to use that information . . . at a trial, unless the failure was substantially justified or is

---

[14]   Unless otherwise set by order of the Court, an expert report is typically due at least ninety (90) days before trial.
Fed. R. Civ. P. 26(a)(2)(d)(i). The *Pretrial Discovery Scheduling Order* required initial expert disclosures to be
exchanged by July 21, 2023. Pretrial Disc. Scheduling Order ¶ 3(b), ECF No. 20 at 2-3. Any changes or additions
to an expert report must be disclosed no later than when final pretrial disclosures are due. Fed. R. Civ. P. 26(e)(2).
Pursuant to the Pretrial Discovery Scheduling Order, the final pretrial disclosures were due fourteen (14) days
prior to the February 20, 2024, final pretrial conference. *See* Pretrial Disc. Scheduling Order ¶ 6, ECF No. 20 at
3. In other words, the final pretrial disclosures, including any supplemental expert reports, were due by February
6, 2024.

[15]   The Defendants never requested leave to file the disclosures late.

harmless." Fed. R. Civ. P. 37(c)(1). "District courts are accorded 'broad discretion' in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014)). Guided by the five-factor test espoused by the Fourth Circuit,[16] the Court found that the untimely disclosure of the Supplemental Kirkland Report was neither substantially justified nor harmless. The Court found that the Liquidating Trustee had been entirely blindsided by the Supplemental Kirkland Report. Although the Supplemental Kirkland Report was clearly available, the Defendants conceded that they had neither served it on nor otherwise provided a copy of it to the Liquidating Trustee prior to filing the Supplemental Kirkland Report with the Court as a Trial exhibit. *See* Day 1 Trial Tr. 16:23-17:5, ECF No. 105 at 16-17 (confirming that the Liquidating Trustee had not had access to the Supplemental Kirkland Report prior to February 26, 2024). There was no way to cure the surprise without completely disrupting the Trial schedule.

In addition to being untimely, the Liquidating Trustee also asserted that the Supplemental Kirkland Report was not a proper supplementation. *Id.* "Courts distinguish true supplementation (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by supplementing an expert report with a new and improved expert report." *E. W., LLC v. Rahman*, No. 1:11-cv-1380-JCC, 2012 WL 4105129, at *6, 2012 U.S. Dist. LEXIS 133381, at *18 (E.D. Va. Sep. 17, 2012). An expert report

---

[16] The factors that courts need to consider include

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

is not supplemental when it "contains new information and expert opinion, intended both as an expansion of [the] earlier expert report as well as a means to impermissibly broaden the scope of the expert opinions that Defendants seek to admit." *Id.* at *7, 2012 U.S. Dist. LEXIS 133381, at *19. "[T]he court has the discretion, as pursuant to Rule 37(c)(1), to exclude these disclosures." *Id.*, 2012 U.S. Dist. LEXIS 133381, at *18 (citing *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003)).

The Supplemental Kirkland Report contained new and previously undisclosed "Supplemental Conclusions," on the subject of which the Liquidating Trustee had not had an opportunity to depose Mr. Kirkland. The Court found that the new information contained in the report was not "supplemental" within the meaning of Rule 26(e) of the Federal Rules of Civil Procedure (the "Rules"). It was not feasible to depose Mr. Kirkland and adequately prepare a response to these new conclusions within the fifteen (15) day period between the date that the Supplemental Kirkland Report was filed with the Court and the date set for the Trial. The Supplemental Kirkland Report had to be stricken pursuant to Rule 37(e).

3.      *The Defendants' Motion in Limine*

The Defendants filed a motion in limine [ECF No. 57] (the "Defendants' Motion to Strike Collura") asking the Court to strike the *Expert Report of Lisa M. Collura, CPA, CFE, CFF* [ECF No. 75] (the "Collura Report")[17] and to prevent Ms. Collura from providing expert testimony. The Defendants complained that the Liquidating Trustee had neglected to provide them with copies of spreadsheets compiled by Ms. Collura for use in her tracing analysis in native format. Def.'s Mot. Strike Collura 2-3, ECF No. 57 at 2-3. The Defendants alleged that withholding the spreadsheets

---

[17]   To distinguish between the factual findings of the Collura Report in each of these two Adversary Proceedings, the Court will refer to the Collura Report as used in the CLC proceeding as the "Collura Report (CLC)" and as used in the LMBC proceeding as the "Collura Report (LMBC)."

in native format prevented their "expert witness from analyzing the tracing work or allowing him to critique any of [Ms.] Collura's calculations." *See id*. at 3, ECF No. 57 at 3.

An expert who provides a written report must disclose, inter alia, "the facts or data considered in forming" her opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii).[18] When these facts and data are contained in electronically stored information ("ESI"), Rule 34 governs. Fed. R. Civ. P. 34.[19] Still, "it is the requesting party's obligation to request ESI in a particular form, or to request specific metadata, if it wants it produced." *Jemsek v. Jemsek Clinic, P.A.* (*In re Jemsek Clinic, P.A.*), Adv. Pro. Nos. 07-3006, 07-03008, 2013 WL 3994663, at *6, 2013 Bankr. LEXIS 3120, at *22 (Bankr. W.D.N.C. Aug. 2, 2013) (citing Fed. R. Civ. P. 34(b)(1)(C)). Unless otherwise specified, the producing party may provide the ESI "as it is kept in its usual course of business or in a 'reasonably usable form or format.'"[20] *Id*., 2013 Bankr. LEXIS 3120, at *22-23 (quoting Fed. R. Civ. P. 34(b)(2)(E)(ii)).

In their first requests for production of documents, the Defendants asked for "[a]ny and all documents relied upon by each expert witness retained by you and reports of any and all expert witnesses you intend to call at trial." Falabella Decl. Ex. 1, ECF No. 80 at 27. The Defendants' requests for production of documents specified that for any "document or other item that is located in or on a computer database . . . or is otherwise in any computerized, electronic, or digital format of any kind," the Liquidating Trustee was to "provide a copy of such document int [sic] its computerized or digital form" [hereinafter *Instruction #5*]. *Id*., ECF No. 80 at 26.

---

[18]   Rule 7026 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") incorporates Rule 26.

[19]   Bankruptcy Rule 7034 incorporates Rule 34.

[20]   For a comprehensive guide to how courts should consider metadata, *see generally The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1, 169-186 (2018).

The Liquidating Trustee maintains that he timely provided to the Defendants his expert disclosures, including the Collura Report and its exhibits, on July 21, 2023. Falabella Decl. ¶ 10, ECF No. 80 at 20. He also produced each of the bank statements and other account information considered by Ms. Collura. *Id.* ¶¶ 10-11, 15-16, ECF No. 80 at 20-21. The Liquidating Trustee provided six spreadsheets detailing the full tracing analysis for each account in the flow of funds analysis to the Defendants in Excel format. *Id.* ¶ 10(b), ECF No. 80 at 20. The Defendants argued that the Collura Report should be stricken because the Liquidating Trustee did not include formulas that the Defendants believed should have been embedded in the produced Excel spreadsheets. The Liquidating Trustee maintains that the Defendants did not ask him to provide the documents used by Ms. Collura in their native format in their document request. The Defendants contend that under Instruction #5, the Liquidating Trustee had a duty to provide responsive ESI in its "original format," which, in turn, would include the embedded formulas.

When a litigant believes the counterparty has failed to comply with Rule 26(a)(2), the correct course of action is to file and properly notice a motion to compel the production of discovery. *See* Fed. R. Civ. P. 26(b)(2)(B) (allowing party to file motion to compel against counterparty refusing to disclose ESI). A party's failure to file a timely motion to compel "may constitute a waiver of discovery violations." *Cont'l Indus., Inc. v. Integrated Logistics Sols., LLC*, 211 F.R.D. 442, 444 (N.D. Okla. 2002) (citing *DesRosiers v. Moran*, 949 F.2d 15, 22 n.8 (1st Cir. 1991)); *see Wootten v. Virginia*, No. 6:14-cv-13, 2015 WL 13658068, at *2, 2015 U.S. Dist. LEXIS 193402, at *4-5 (W.D. Va. June 9, 2015) (collecting cases). "Courts generally consider motions to compel untimely when they are filed after the discovery deadline." *Wooten*, 2015 WL 13658068, at *2, 2015 U.S. Dist. LEXIS 193402, at *4.

The Court found that this was what had transpired here.  The Defendants waived any remedy they may have had to this alleged discovery dispute because the Defendants filed their motions to compel after the close of discovery.  Defs.' Mot. to Compel Disc., ECF No. 28. Furthermore, the Defendants never noticed the tardy motions to compel that they did file for hearing as required by Local Bankruptcy Rule 9013-1(H)(2).  Without properly noticing the motions to compel for hearing, the Court never had the opportunity to consider the dispute in the correct procedural posture.  A motion in limine on the eve of trial was not the proper vehicle in which to address the discovery dispute.  Accordingly, the Court denied the Defendants' Motion to Strike Collura.

Nevertheless, it appears that the Trustee had satisfactorily produced the spreadsheets in accordance with the Defendants' document requests.  To obtain metadata, the caselaw indicates that the requesting party must either ask for the native format[21] of the ESI or specifically request the metadata.  *See Aguilar v. Immigr. & Customs Enf't Div.*, 255 F.R.D. 350, 357-58 (S.D.N.Y. 2008) (collecting cases).  When the "party wants metadata, it should 'Ask for it.  Up front. Otherwise, if [the party] ask[s] too late or ha[s] already received the document in another form, [it] may be out of luck.'"  *Id.* at 357 (alterations in original) (citing Adam J. Levitt & Scott J. Farrell, *Taming the Metadata Beast*, N.Y.L.J., May 16, 2008, at 4).

Instruction #5 required the Liquidating Trustee to produce ESI in "its computerized or digital form."  Falabella Decl. Ex. 1, ECF No. 80 at 26.  The request for the "computerized or digital form" of documents stored on a computer or computer database is not the same thing as a request for "native format."  *See Aguilar*, 255 F.R.D. at 352 n.4.  Nor is it a request for metadata.

---

[21] Typically, "[n]ative format is the 'default format of a file,' access to which is 'typically provided through the software program on which it was created.'"  *Aguilar*, 255 F.R.D. at 353 n.4 (quoting *In re Priceline.com Inc. Sec. Litig.*, 233 F.R.D. 88, 89 (D. Conn. 2005)).

The requesting party is "the master of its production requests; it must be satisfied with what it asks for." *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 248 F.R.D. 556, 560 (N.D. Ill. 2008) (where request for production failed to specify the form for production, the court found it reasonable that plaintiff produced documents in PDF format); *see also Ky. Speedway, LLC v. NASCAR, Inc.*, No. 05-138-WOB, 2006 WL 5097354, at *7-8, 2006 U.S. Dist. LEXIS 92028, at *21-25 (E.D. Ky. Dec. 18, 2006) (determining that Rule 34 does not require metadata be turned over automatically).

The Court found that the Liquidating Trustee had produced the spreadsheets in a "reasonably usable form." *See* Fed. R. Civ. P. 34(a)(1)(A). Courts that have required the producing party to provide an application's metadata have done so where "it is critical to understanding" the program. *Aguilar*, 255 F.R.D. at 354 (internal citation omitted). "'A spreadsheet application lies somewhere in the middle' and the need for its metadata depends upon the complexity and purpose of the spreadsheet." *Id*. (internal citation omitted). A LIBR analysis requires only simple arithmetic that can be conducted using a handheld calculator. Day 1 Trial Tr. 32:22-24; 112:24-113:1, ECF No. 105 at 32, 112-113. The spreadsheets at issue here simply tracked the transactions in the Dent, HisWay, and BlueWave bank accounts over a period of several years. There is nothing "complex" about these spreadsheets. For these reasons, even if the Defendants had noticed for hearing their untimely motions to compel the production of the metadata as required by the Local Bankruptcy Rules, the request would likely have been denied.

### The Trial

At Trial, Lisa Collura was called as the Liquidating Trustee's sole witness to testify as an expert in the field of forensic accounting and tracing.[22] Ms. Collura testified that tracing is

---

[22] The Defendants did not challenge Ms. Collura's qualification as an expert.

employed to follow the flow of money in and out of bank accounts.  Day 1 Trial Tr. 51:21-22, ECF

No. 105 at 51.  In cases where a bank account has multiple sources of funds, tracing methodologies

must be applied to the activity in a commingled account in order to trace particular funds through

the account so that an outflow of funds can be attributable to a particular source of funds.  *Id*.

51:23-52:3, ECF No. 105 at 51-52.  Ms. Collura was asked to trace HDL funds through a number

of bank accounts to determine the amount of HDL funds that went to the Defendants.  Collura

Report (CLC) ¶ 9, ECF No. 75 at 5.

     Ms. Collura analyzed the account statements for the following eight accounts all of which

received funds directly or indirectly from HDL:

| Account Holder | Banking Institution | Account # | Period of Available Records |
|---|---|---|---|
| BlueWave Healthcare Consultants, Inc. | Superior/Cadence | xxxxx4230 | Nov 2009 – Mar 2016 |
| His Way of SC | Wells Fargo | xxxxxx4288 | May 2010 – Nov 2018 |
| His Way of SC | Wells Fargo | xxxxxx2955 | Nov 2010 – Nov 2018 |
| Floyd Calhoun Dent III & Christina M Dent | Wells Fargo | xxxxxx6757 | Mar 2011 – Nov 2018 |
| Floyd Calhoun Dent III & Christina M Dent | Wells Fargo | xxxxxx8393 | Aug 2012 – Nov 2018 |
| Floyd Calhoun Dent III & Christina M Dent | BB&T | xxxxxx3952 | Jan 2014 – Apr 2019 |
| F Cal Dent III | Wells Fargo | xxxxxx9895 | Oct 2009 – Nov 2018 |
| Floyd Calhoun Dent III & Christina M Dent | BB&T | xxxxxx9749 | Nov 2014 – Apr 2019 |

Collura Report (LMBC) ¶ 16 & fig. 1, Adv. Pro. No. 22-03036, ECF No. 76 at 7-8.  (The

Superior/Cadence Bank account is hereinafter referred to as the "BlueWave Account."  The Wells

Fargo accounts are hereinafter referred to as the "HisWay 4288 Account," the "HisWay 2955

Account," the "Dent 6757 Account," the "Dent 8393 Account," and the "Dent 9895 Account,"

respectively, and collectively as the "Dent Accounts."  The BB&T accounts are hereinafter

referred to as the "Floyd and Christina Dent 3952 Account" and the "Floyd and Christina Dent

9749 Account," respectively, and together as the "BB&T Accounts."  The BlueWave Account, the

Dent Accounts, and the BB&T Accounts are collectively referred to as the "Accounts."). [23]  All of
the Accounts received HDL funds either directly from HDL or indirectly from HDL through one
of the other Accounts.  *Id.* ¶ 17, Adv. Pro. No. 22-03036, ECF No. 76 at 9.

Ms. Collura examined the bank records and bank statements for each of these Accounts on
a transaction-by-transaction basis.  Ms. Collura organized the incoming and outgoing cash
transactions in chronological order to determine the sources and uses of funds for each of the
Accounts.  Day 1 Trial Tr. 53:5-10, ECF No. 105 at 53.

*1.     The BlueWave Account*

Between November 2009 and March 2016, approximately $257 million in total funds
flowed into the BlueWave Account.  Collura Report (CLC) ¶ 21, ECF No. 75 at 10.  Of the funds
that flowed into the BlueWave Account, Ms. Collura was able to identify deposits totaling
$220,336,248 that came directly from HDL.  *Id.*

*2.     The HisWay 4288 Account*

The HisWay 4288 Account had total inflows of approximately $11.4 million between May
2010 and November 2018.  *Id.* ¶ 22, ECF No. 75 at 10.  Out of these inflows, Ms. Collura was able
to identify deposits totaling $9,502,050 that came from the BlueWave Account, which had
received funds directly from HDL.  *Id.* fig. 3, ECF No. 75 at 11.

*3.     The HisWay 2955 Account*

Between November 2010 and November 2018, the HisWay 2955 Account had total inflows
of approximately $14.4 million.  *Id.* ¶ 23, ECF No. 75 at 11.  Out of these inflows, Ms. Collura
was able to identify deposits totaling $2,614,596 that came from the BlueWave Account, which

---

[23]   The Parties stipulated to the admissibility of the bank records.  Joint Stip. ¶ 8, Adv. Pro. No. 22-03020, ECF No.
86 at 3; Joint Stip. ¶ 7, Adv. Pro. No. 22 03036, ECF No. 89 at 3-4.

had received funds directly from HDL, and deposits totaling $11,278,006 that came from the HisWay 4288 Account, which had received funds from the BlueWave Account. *Id.*

4.      *The Dent 6757 Account*

The Dent 6757 Account had approximately $1.3 million of inflows from March 2011 to November 2018. *Id.* ¶ 24, ECF No. 75 at 12. Out of these inflows, Ms. Collura was able to identify deposits totaling $250,000 that came from the BlueWave Account, which had received funds directly from HDL. *Id.*

5.      *The Dent 8393 Account*

Beginning in August 2012 and continuing through November 2018, the Dent 8393 Account had approximately $8.9 million in inflows. *Id.* ¶ 25, ECF No. 75 at 12. Out of these inflows, Ms. Collura was able to identify deposits totaling $8.5 million that came from the BlueWave Account, which had received funds from HDL, and deposits totaling $340,000 that came from the Dent 6757 Account, which had received funds from the BlueWave Account. *Id.*

6.      *The Dent 9895 Account*

From October 2009 through November 2018, there were approximately $29.9 million of inflows into the Dent 9895 Account. *Id.* ¶ 26, ECF No. 75 at 13. Out of these inflows, Ms. Collura was able to identify deposits totaling $720,661 that came directly from HDL and deposits totaling $17.8 million that came from the BlueWave Account, which had received funds directly from HDL. *Id.* The Dent 9895 Account also received $54,466 from the HisWay 4288 Account, $2,297,383 from the HisWay 2955 Account, $460,000 from the Dent 6757 Account, and $6,066,000 from the Dent 8393 Account, all of which had received funds from the BlueWave Account. *Id.* ¶ 26 & fig. 7, ECF No. 75 at 13-14.

24

7.    *The Floyd and Christina Dent 3952 Account*

Between January 2014 and November 2018, there were approximate inflows into the Floyd and Christina Dent 3952 Account of $1.7 million.  Collura Report (LMBC) ¶ 26, Adv. Pro. No. 22-03036, ECF No. 76 at 13.  Out of these inflows, Ms. Collura was able to identify deposits totaling $1.5 million from the BlueWave Account, which had received funds directly from HDL. *Id.* ¶ 26 & fig. 7, Adv. Pro. No. 22-03036, ECF No. 76 at 13.

8.    *The Floyd and Christina Dent 9749 Account*

Between November 2014 and December 2018, there were approximately $1.9 million of inflows into the Floyd and Christina Dent 9749 Account.  *Id.* ¶ 28, Adv. Pro. No. 22-03036, ECF No. 76 at 13.  Out of these inflows, Ms. Collura was able to identify deposits totaling $1.5 million from the Floyd and Christina Dent 3952 Account, which had received funds from the BlueWave Account.  *Id.*

Based on this review of the bank records and the chronological listings of transactions related to these Accounts, Ms. Collura was able to identify eight transfers totaling $1,355,920 that came from the Dent 9895 Account into the Defendant CLC from February 2010 to January 2014. Collura Report (CLC) ¶ 30 & fig. 8, ECF No. 75 at 15.  The Court found from the evidence presented that the funds flowed from HDL to CLC in the following manner:



*Id.*

Ms. Collura conducted a similar analysis for the Donations received by LMBC.  Ms. Collura was able to identify transfers totaling $375,876 from Dent to LMBC from August 2013 to October 2018.  Collura Report (LMBC) ¶ 32 & fig. 10, Adv. Pro. No. 22-03036, ECF No. 76 at 16-17.  The Court found from the evidence presented that the funds flowed from HDL to LMBC in the following manner:



*Id.*

Ms. Collura testified that there were transfers of funds from sources other than HDL that also went into the Accounts.  *See, e.g.*, Day 1 Trial Tr. 52:19-23, ECF No. 105 at 52.  As the Accounts were commingled, Ms. Collura applied the Lowest Intermediate Balance Rule ("LIBR") to the transactional data in the bank records to trace the subsequent transfers of HDL funds to the Defendants.  *Id.* 53:12-16, ECF No. 105 at 53.  The LIBR is a method of tracing that assumes that the HDL funds deposited into one of the commingled bank Accounts are the last funds disbursed from that Account.

Ms. Collura created a running balance for the amount of HDL funds that were deposited into each of the Accounts. Ms. Collura assumed that any disbursements made from an Account would be taken first from funds other than the HDL funds until the balance in the account dipped below the amount of the HDL funds. Subsequent disbursements would be taken from HDL funds only when the non-HDL funds had been exhausted and the balance in the Account (i.e., the lowest intermediate balance) fell below the running balance of HDL funds in the Account. Collura Report (CLC) ¶ 33, ECF No. 75 at 16.

Ms. Collura compared the running balance of HDL funds on deposit in the Dent 9895 Account to the total amount on deposit in that account on the date that each donation was made to Defendant CLC. As a result of her application of the LIBR tracing method, Ms. Collura was able to determine that $1,149,900 of the Donations that Defendant CLC received from the Dent 9895 Account were traceable to HDL as follows:

**Table 1. Dent 9895 Account – Analysis of Transfers to CLC**

| Transfer | Date | Check No. | Transfer Amount ($) | Account Balance ($) | HDL Running Balance at Time of Transfer ($) | Other Available Funds in Account ($) | Debit from HDL Running Balance ($) | Debit from Other Available Funds in Account ($) | LIBR Result ($) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2/9/2010 | 2910 | (20) | 21,716 | 0 | 21,716 | 0 | (20) | 0 |
| 2 | 11/16/2011 | 3452 | (24,000) | 963,642.94 | 963,642.94 | 0 | (24,000.00) | 0 | 24,000.00 |
| 3 | 2/27/2012 | 3536 | (25,000) | 1,783,647.15 | 1,783,647.15 | 0 | (25,000.00) | 0 | 25,000.00 |
| 4 | 2/27/2012 | 3541 | (900) | 1,782,747.15 | 1,782,747.15 | 0 | (900.00) | 0 | 900.00 |
| 5 | 4/26/2012 | 3595 | (106,000) | 3,260,530.96 | 2,996,358.00 | 264,172.96 | 0 | (106,000.00) | 0 |
| 6 | 7/9/2012 | 3633 | (100,000) | 2,746,584.83 | 2,746,584.83 | 0 | (100,000.00) | 0 | 100,000.00 |
| 7 | 12/20/2012 | 3755 | (1,000,000) | 2,906,881.53 | 2,906,881.53 | 0 | (1,000,000.00) | 0 | 1,000,000.00 |
| 8 | 1/8/2014 | 4070 | (100,000) | 3,014,855.79 | 2,703,941.85 | 310,913.94 | 0 | (100,000.00) | 0 |
| **Total** | | | **(1,355,920.00)** | | | | **(1,149,900.00)** | **(206,020.00)** | **1,149,900.00** |

*Id.* Ex. 8, ECF No. 75 at 39-40;[24] *see also* Day 1 Trial Tr. 71:18-72:11, ECF No. 105 at 71-72.[25]

The Court found based on this LIBR analysis that CLC received $1,149,900 of the Debtors'

fraudulently transferred funds.

Applying the same methodology, Ms. Collura was able to trace $238,512 of the Donations

that Defendant LMBC received from the Dent 9895 Account and the Floyd and Christina Dent

9749 Account to the Avoided Transfers as follows:

**Table 2.  Dent 9895 Account – Analysis of Transfers to LMBC**

| Transfer | Date | Description | Transfer Amount ($) | Account Balance ($) | HDL Running Balance at Time of Transfer ($) | Other Available Funds in Account ($) | Debit from HDL Running Balance ($) | Debit from Other Available Funds in Account ($) | LIBR Result ($) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/20/2013 | Check 3935 | (22,000) | 1,258,547 | 1,258,547 | 0 | (22,000) | 0 | 22,000 |
| 2 | 12/23/2014 | Check | (18,500) | 130,874 | 130,874 | 0 | (18,500) | 0 | 18,500 |
| 3 | 7/20/2015 | Check | (14,500) | 70,620 | 52,450 | 18,170 | 0 | (14,500) | 0 |

---

[24] Exhibit 8 was provided to the Court in Excel format.  The Bates reference for the transfers listed in this Table 1 are as follows:

| Transfer | Bank Statement | Check |
|---|---|---|
| 1 | LT0013188 | LT0013194 |
| 2 | LT0013415 | LT0022637 |
| 3 | LT0012706 | LT0011099 |
| 4 | LT0012706 | LT0011098 |
| 5 | LT0012706 | LT0011143 |
| 6 | LT0012706 | LT0011171 |
| 7 | LT0012706 | LT0011275 |
| 8 | LT0012706 | LT0011042 |

See Pl.'s Exs. 4-21 [ECF No. 65], 4-28 [ECF No. 65], 4-30 [ECF No. 65], and 4-32 [ECF No. 65], Adv. Pro. No. 22-03020, for the Bates numbered documents.

[25] The chart shows that the first donation (transfer #1) CLC received from the Dent 9895 Account on February 9, 2021, in the amount of $20 (*see* fourth column) did not come from HDL funds because the running balance of HDL funds in the Dent 9895 Account at the time of the transfer (*see* sixth column) was less than the account balance prior to the transfer (*see* fifth column).  The entire donation, therefore, was debited from other available funds in the Account (*see* seventh column and ninth column).  The corresponding LIBR Result (*see* last column) was, therefore, $0.

The second line of the chart for transfer #2 serves up a different result.  There, the second donation that CLC received in the amount of $24,000 (*see* fourth column) came entirely from HDL funds because the running balance of HDL funds that had flowed into the Dent 9895 Account (*see* sixth column) accounted for the only funds remaining in the Dent 9895 Account at the time of the donation (*see* fifth column).  There were no other funds remaining in the Account (*see* seventh column) from which the donation could have been made.  Accordingly, the corresponding LIBR Result (*see* last column) was $24,000, which was the full amount of the transfer.

This analysis repeats for transfers #3 through #8.  The corresponding LIBR Results for each transfer tallied in the last column were then added together to yield the total amount of traceable funds.

| Transfer | Date | Description | Transfer Amount ($) | Account Balance ($) | HDL Running Balance at Time of Transfer ($) | Other Available Funds in Account ($) | Debit from HDL Running Balance ($) | Debit from Other Available Funds in Account ($) | LIBR Result ($) |
|---|---|---|---|---|---|---|---|---|---|
| 4 | 2/23/2016 | Check | (4,500) | 32,466 | 28,904 | 3,562 | 0 | (4,500) | 0 |
| 5 | 3/8/2016 | Check | (500) | 25,019 | 25,019 | 0 | (500) | 0 | 500 |
| 6 | 3/15/2016 | Check | (500) | 46,176 | 46,176 | 0 | (500) | 0 | 500 |
| 7 | 3/29/2016 | Check | (1,000) | 41,930 | 41,930 | 0 | (1,000) | 0 | 1,000 |
| 8 | 4/12/2016 | Check | (1,000) | 44,879 | 44,879 | 0 | (1,000) | 0 | 1,000 |
| 9 | 4/12/2016 | Check | (3,700) | 40,977 | 40,977 | 0 | (3,700) | 0 | 3,700 |
| 10 | 4/26/2016 | Check | (1,000) | 26,868 | 26,868 | 0 | (1,000) | 0 | 1,000 |
| 11 | 5/3/2016 | Check | (500) | 18,123 | 18,123 | 0 | (500) | 0 | 500 |
| 12 | 5/10/2016 | Check | (500) | 15,662 | 15,662 | 0 | (500) | 0 | 500 |
| 13 | 5/17/2016 | Check | (500) | 12,286 | 12,286 | 0 | (500) | 0 | 500 |
| 14 | 5/24/2016 | Check | (500) | 11,015 | 11,015 | 0 | (500) | 0 | 500 |
| 15 | 6/1/2016 | Check | (500) | 7,121 | 7,121 | 0 | (499) | (1) | 499 |
| 16 | 6/14/2016 | Check | (1,000) | 27,541 | 27,541 | 0 | (1,000) | 0 | 1,000 |
| 17 | 6/21/2016 | Check | (500) | 25,183 | 25,183 | 0 | (500) | 0 | 500 |
| 18 | 6/28/2016 | Check | (500) | 19,451 | 19,451 | 0 | (500) | 0 | 500 |
| 19 | 7/19/2016 | Check | (1,500) | 11,775 | 11,775 | 0 | (1,500) | 0 | 1,500 |
| 20 | 8/2/2016 | Check | (1,000) | 25,521 | 25,521 | 0 | (1,000) | 0 | 1,000 |
| 21 | 8/9/2016 | Check | (1,000) | 19,728 | 19,728 | 0 | (1,000) | 0 | 1,000 |
| 22 | 8/16/2016 | Check | (500) | 18,284 | 18,284 | 0 | (500) | 0 | 500 |
| 23 | 8/23/2016 | Check | (500) | 12,730 | 12,730 | 0 | (500) | 0 | 500 |
| 24 | 9/20/2016 | Check | (2,000) | 20,129 | 20,129 | 0 | (2,000) | 0 | 2,000 |
| 25 | 9/27/2016 | Check | (1,000) | 34,713 | 17,310 | 17,403 | 0 | (1,000) | 0 |
| 26 | 10/4/2016 | Check | (500) | 31,481 | 17,310 | 14,171 | 0 | (500) | 0 |
| 27 | 10/18/2016 | Check | (1,000) | 26,766 | 17,310 | 9,456 | 0 | (1,000) | 0 |
| 28 | 10/25/2016 | Check | (500) | 45,097 | 42,310 | 2,787 | 0 | (500) | 0 |
| 29 | 11/8/2016 | Check | (1,000) | 16,258 | 16,258 | 0 | (1,000) | 0 | 1,000 |
| 30 | 11/22/2016 | Check | (1,000) | 14,175 | 14,175 | 0 | (1,000) | 0 | 1,000 |
| 31 | 12/6/2016 | Check | (1,000) | 5,332 | 5,332 | 0 | (1,000) | 0 | 1,000 |
| 32 | 12/13/2016 | Check | (500) | 3,207 | 3,207 | 0 | (500) | 0 | 500 |
| 33 | 12/20/2016 | Check | (500) | 11,684 | 11,684 | 0 | (500) | 0 | 500 |
| 34 | 12/29/2016 | Check | (500) | 10,125 | 10,125 | 0 | (500) | 0 | 500 |
| 35 | 1/10/2017 | Check | (1,000) | 7,473 | 7,473 | 0 | (1,000) | 0 | 1,000 |
| 36 | 1/24/2017 | Check | (1,000) | 6,669 | 6,669 | 0 | (1,000) | 0 | 1,000 |
| 37 | 1/31/2017 | Check | (500) | 5,395 | 5,395 | 0 | (500) | 0 | 500 |
| 38 | 2/14/2017 | Check | (500) | 9,074 | 9,074 | 0 | (500) | 0 | 500 |
| 39 | 2/21/2017 | Check | (500) | 4,255 | 4,255 | 0 | (500) | 0 | 500 |
| 40 | 2/28/2017 | Check | (500) | 2,542 | 2,542 | 0 | (500) | 0 | 500 |
| 41 | 3/7/2017 | Check | (500) | 7,817 | 7,817 | 0 | (500) | 0 | 500 |
| 42 | 3/14/2017 | Check | (500) | 5,543 | 5,543 | 0 | (500) | 0 | 500 |
| 43 | 3/21/2017 | Check | (500) | 8,119 | 8,119 | 0 | (500) | 0 | 500 |
| 44 | 3/21/2017 | Check | (500) | 7,619 | 7,619 | 0 | (500) | 0 | 500 |
| 45 | 4/4/2017 | Check | (1,000) | 11,493 | 11,493 | 0 | (1,000) | 0 | 1,000 |
| 46 | 4/18/2017 | Check | (1,000) | 16,908 | 16,908 | 0 | (1,000) | 0 | 1,000 |
| 47 | 4/25/2017 | Check | (500) | 15,324 | 15,324 | 0 | (500) | 0 | 500 |
| 48 | 5/2/2017 | Check | (500) | 14,492 | 14,492 | 0 | (500) | 0 | 500 |
| 49 | 5/9/2017 | Check | (500) | 12,863 | 12,863 | 0 | (500) | 0 | 500 |
| 50 | 5/23/2017 | Check | (1,000) | 11,176 | 11,176 | 0 | (1,000) | 0 | 1,000 |
| 51 | 5/31/2017 | Check | (500) | 8,955 | 8,955 | 0 | (500) | 0 | 500 |
| 52 | 6/20/2017 | Check | (1,500) | 11,360 | 11,360 | 0 | (1,500) | 0 | 1,500 |
| 53 | 7/5/2017 | Check | (1,000) | 5,611 | 5,611 | 0 | (1,000) | 0 | 1,000 |
| 54 | 7/17/2017 | Check | (1,000) | 9,477 | 9,477 | 0 | (1,000) | 0 | 1,000 |
| 55 | 7/25/2017 | Check | (500) | 6,764 | 6,764 | 0 | (500) | 0 | 500 |
| 56 | 8/1/2017 | Check | (500) | 13,806 | 13,806 | 0 | (500) | 0 | 500 |
| 57 | 8/15/2017 | Check | (1,000) | 9,437 | 9,437 | 0 | (1,000) | 0 | 1,000 |
| 58 | 8/22/2017 | Check | (500) | 6,744 | 6,744 | 0 | (500) | 0 | 500 |
| 59 | 9/14/2017 | Check | (1,500) | 13,291 | 13,291 | 0 | (1,500) | 0 | 1,500 |
| 60 | 9/19/2017 | Check | (500) | 21,583 | 21,583 | 0 | (500) | 0 | 500 |
| 61 | 10/3/2017 | Check | (1,000) | 14,874 | 8,376 | 6,498 | 0 | (1,000) | 0 |
| 62 | 10/10/2017 | Check | (500) | 9,595 | 8,376 | 1,219 | 0 | (500) | 0 |
| 63 | 10/24/2017 | Check | (1,000) | 242,051 | 8,376 | 233,675 | 0 | (1,000) | 0 |
| 64 | 10/31/2017 | Check | (1,000) | 213,999 | 8,376 | 205,623 | 0 | (1,000) | 0 |
| 65 | 11/14/2017 | Check | (1,200) | 212,744 | 8,376 | 204,367 | 0 | (1,200) | 0 |
| 66 | 11/7/2017 | Check | (1,000) | 244,090 | 8,376 | 235,714 | 0 | (1,000) | 0 |
| 67 | 11/28/2017 | Check | (2,000) | 240,926 | 8,376 | 232,549 | 0 | (2,000) | 0 |
| 68 | 12/5/2017 | Check | (1,000) | 232,727 | 8,376 | 224,350 | 0 | (1,000) | 0 |
| 69 | 12/12/2017 | Check | (1,000) | 230,241 | 8,376 | 221,865 | 0 | (1,000) | 0 |
| 70 | 12/14/2017 | Check | (3,000) | 226,834 | 8,376 | 218,458 | 0 | (3,000) | 0 |
| 71 | 12/19/2017 | Check | (1,000) | 214,143 | 8,376 | 205,767 | 0 | (1,000) | 0 |
| 72 | 12/29/2017 | Check | (1,000) | 209,666 | 8,376 | 201,290 | 0 | (1,000) | 0 |

| Transfer | Date | Description | Transfer Amount ($) | Account Balance ($) | HDL Running Balance at Time of Transfer ($) | Other Available Funds in Account ($) | Debit from HDL Running Balance ($) | Debit from Other Available Funds in Account ($) | LIBR Result ($) |
|---|---|---|---|---|---|---|---|---|---|
| 73 | 12/29/2017 | Check | (1,000) | 208,666 | 8,376 | 200,290 | 0 | (1,000) | 0 |
| 74 | 1/9/2018 | Check | (2,000) | 190,059 | 8,376 | 181,683 | 0 | (2,000) | 0 |
| 75 | 1/23/2018 | Check | (1,000) | 208,867 | 8,376 | 200,491 | 0 | (1,000) | 0 |
| 76 | 2/6/2018 | Check | (1,000) | 51,860 | 8,376 | 43,484 | 0 | (1,000) | 0 |
| 77 | 2/13/2018 | Check | (1,000) | 38,166 | 8,376 | 29,790 | 0 | (1,000) | 0 |
| 78 | 2/20/2018 | Check | (500) | 37,184 | 8,376 | 28,808 | 0 | (500) | 0 |
| 79 | 3/6/2018 | Check | (1,000) | 28,095 | 8,376 | 19,718 | 0 | (1,000) | 0 |
| 80 | 3/13/2018 | Check | (500) | 26,429 | 8,376 | 18,053 | 0 | (500) | 0 |
| 81 | 4/3/2018 | Check | (1,500) | 22,332 | 8,376 | 13,956 | 0 | (1,500) | 0 |
| 82 | 4/17/2018 | Check | (1,000) | 13,007 | 8,376 | 4,631 | 0 | (1,000) | 0 |
| 83 | 5/1/2018 | Check | (1,000) | 10,109 | 10,109 | 0 | (1,000) | 0 | 1,000 |
| 84 | 5/22/2018 | Check | (1,500) | 54,228 | 5,975 | 48,253 | 0 | (1,500) | 0 |
| 85 | 5/30/2018 | Check | (500) | 50,973 | 5,975 | 44,998 | 0 | (500) | 0 |
| 86 | 6/5/2018 | Check | (500) | 38,081 | 5,975 | 32,105 | 0 | (500) | 0 |
| 87 | 6/26/2018 | Check | (1,500) | 29,688 | 5,975 | 23,713 | 0 | (1,500) | 0 |
| 88 | 7/2/2018 | Check | (3,000) | 26,061 | 5,975 | 20,086 | 0 | (3,000) | 0 |
| 89 | 7/11/2018 | Check | (1,000) | 19,675 | 5,975 | 13,700 | 0 | (1,000) | 0 |
| 90 | 7/31/2018 | Check | (1,000) | 37,668 | 30,972 | 6,696 | 0 | (1,000) | 0 |
| 91 | 8/7/2018 | Check | (500) | 33,281 | 30,972 | 3,486 | 0 | (500) | 0 |
| 92 | 8/14/2018 | Check | (500) | 41,082 | 30,972 | 2,308 | 0 | (500) | 0 |
| 93 | 8/21/2018 | Check | (1,000) | 34,022 | 41,082 | 0 | (1,000) | 0 | 1,000 |
| 94 | 9/11/2018 | Check | (1,500) | 30,577 | 34,022 | 0 | (1,500) | 0 | 1,500 |
| 95 | 9/18/2018 | Check | (500) | 1,258,547 | 33,301 | 0 | (500) | 0 | 500 |
| 96 | 9/25/2018 | Check | (500) | 130,874 | 31,463 | 0 | (500) | 0 | 500 |
| 97 | 10/2/2018 | Check | (550) | 70,620 | 30,577 | 0 | (550) | 0 | 550 |
| 98 | 10/16/2018 | Check | (1,000) | 32,466 | 14,059 | 0 | (1,000) | 0 | 1,000 |
| **Total** | | | **(145,950)** | | | | **(88,749)** | **(57,201)** | **88,749** |

Collura Report (LMBC) Ex. 9, Adv. Pro. No. 22-03036, ECF No 76 at 44-45;[26] *see also* Day 1

Trial Tr. 80:5-81:5, ECF No. 105 at 80-81.

---

[26]    Exhibit 9 was provided to the Court in Excel format.  The Bates reference for the transfers listed in this Table 2 are as follows:

| Transfer | Bank Statement | Check | Transfer | Bank Statement | Check |
|---|---|---|---|---|---|
| 1 | LT0012706 | LT0011042 | 50 | LT0009798 | LT0012042 |
| 2 | LT0009501 | LT0011042 | 51 | LT0009798 | LT0012042 |
| 3 | LT0009569 | LT0011042 | 52 | LT0009809 | LT0012042 |
| 4 | LT0009638 | LT0011042 | 53 | LT0009819 | LT0012042 |
| 5 | LT0009649 | LT0011042 | 54 | LT0009820 | LT0012042 |
| 6 | LT0009649 | LT0012036 | 55 | LT0009820 | LT0012042 |
| 7 | LT0009649 | LT0012042 | 56 | LT0009829 | LT0012042 |
| 8 | LT0009659 | LT0012042 | 57 | LT0009830 | LT0012042 |
| 9 | LT0009659 | LT0012042 | 58 | LT0009830 | LT0012042 |
| 10 | LT0009660 | LT0012042 | 59 | LT0009840 | LT0012042 |
| 11 | LT0009669 | LT0012042 | 60 | LT0009840 | LT0012042 |
| 12 | LT0009669 | LT0012042 | 61 | LT0009849 | LT0012042 |
| 13 | LT0009670 | LT0012042 | 62 | LT0009849 | LT0012042 |
| 14 | LT0009670 | LT0012042 | 63 | LT0009850 | LT0012042 |
| 15 | LT0009680 | LT0012042 | 64 | LT0009851 | LT0012042 |
| 16 | LT0009680 | LT0012042 | 65 | LT0009861 | LT0012042 |
| 17 | LT0009681 | LT0012042 | 66 | LT0009860 | LT0012042 |
| 18 | LT0009681 | LT0012042 | 67 | LT0009862 | LT0012042 |
| 19 | LT0009689 | LT0012042 | 68 | LT0009871 | LT0012042 |
| 20 | LT0009698 | LT0012042 | 69 | LT0009872 | LT0012042 |
| 21 | LT0009698 | LT0012042 | 70 | LT0009872 | LT0012042 |
| 22 | LT0009699 | LT0012042 | 71 | LT0009872 | LT0012042 |
| 23 | LT0009699 | LT0012042 | 72 | LT0009873 | LT0012042 |
| 24 | LT0009709 | LT0012042 | 73 | LT0009873 | LT0012042 |
| 25 | LT0009710 | LT0012042 | 74 | LT0009882 | LT0012042 |
| 26 | LT0009719 | LT0012042 | 75 | LT0009883 | LT0012042 |
| 27 | LT0009720 | LT0012042 | 76 | LT0009884 | LT0012042 |

**Table 3. Floyd and Christina Dent 9749 Account – Analysis of Transfers to LMBC**

| Transfer | Date | Check No. | Transfer Amount ($) | Account Balance ($) | HDL Running Balance ($) | Other Available Funds in Account ($) | Debit from HDL Running Balance ($) | Debit from Other Available Funds in Account ($) | LIBR Result ($) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/22/2015 | 110 | (85,000.00) | 971,809 | 971,809 | 0 | (85,000) | 0 | 85,000 |
| 2 | 5/25/2017 | 119 | (64,926.00) | 432,103 | 432,103 | 0 | (64,763) | (163) | 64,763 |
| 3 | 10/26/2017 | 122 | (50,000.00) | 533,625 | 182,336 | 351,290 | 0 | (50,000) | 0 |
| 4 | 10/26/2017 | 124 | (10,000.00) | 523,625 | 182,336 | 341,290 | 0 | (10,000) | 0 |
| 5 | 10/26/2017 | 125 | (20,000.00) | 503,625 | 182,336 | 321,290 | 0 | (20,000) | 0 |
| Total | | | (229,926.00) | | | | (149,763) | (80,163) | 149,763 |

Collura Report (LMBC) Ex. 10, Adv. Pro. No. 22-03036, ECF No 76 at 46-47;[27] *see also* Day 1 Trial Tr. 80:5-81:5, ECF No. 105 at 80-81. The Court found based on this LIBR analysis that LMBC received $238,512 of the Debtors' fraudulently transferred funds, receiving $88,749 from the Dent 9895 Account and $149,763 from the Floyd and Christina Dent 9749 Account.

| | | | | |
|---|---|---|---|---|
| 28 | LT0009720 | LT0012042 | 77 | LT0009893 | LT0012042 |
| 29 | LT0009728 | LT0012042 | 78 | LT0009893 | LT0012042 |
| 30 | LT0009728 | LT0012042 | 79 | LT0009905 | LT0012042 |
| 31 | LT0009738 | LT0012042 | 80 | LT0009906 | LT0012042 |
| 32 | LT0009738 | LT0012042 | 81 | LT0009916 | LT0012042 |
| 33 | LT0009739 | LT0012042 | 82 | LT0009916 | LT0012042 |
| 34 | LT0009739 | LT0012042 | 83 | LT0009926 | LT0012042 |
| 35 | LT0009749 | LT0012042 | 84 | LT0009927 | LT0012042 |
| 36 | LT0009750 | LT0012042 | 85 | LT0009927 | LT0012042 |
| 37 | LT0009750 | LT0012042 | 86 | LT0009936 | LT0012042 |
| 38 | LT0009762 | LT0012042 | 87 | LT0009937 | LT0012042 |
| 39 | LT0009762 | LT0012042 | 88 | LT0009947 | LT0012042 |
| 40 | LT0009762 | LT0012042 | 89 | LT0009948 | LT0012042 |
| 41 | LT0009771 | LT0012042 | 90 | LT0009948 | LT0012042 |
| 42 | LT0009772 | LT0012042 | 91 | LT0009958 | LT0012042 |
| 43 | LT0009772 | LT0012042 | 92 | LT0009958 | LT0012042 |
| 44 | LT0009772 | LT0012042 | 93 | LT0009959 | LT0012042 |
| 45 | LT0009785 | LT0012042 | 94 | LT0009968 | LT0012042 |
| 46 | LT0009786 | LT0012042 | 95 | LT0009968 | LT0012042 |
| 47 | LT0009786 | LT0012042 | 96 | LT0009968 | LT0012042 |
| 48 | LT0009797 | LT0012042 | 97 | LT0009978 | LT0012042 |
| 49 | LT0009798 | LT0012042 | 98 | LT0009979 | LT0012042 |

See Pl.'s Exs. 4-3 [ECF No. 66], 4-4 [ECF No. 66], 4-18 [ECF No. 66], 4-22 [ECF No. 66], and 4-23 [ECF No. 66], Adv. Pro. No. 22-03036, for the Bates numbered documents.

[27] Exhibit 10 was provided to the Court in Excel format. The Bates reference for the transfers listed in this Table 3 are as follows:

| Transfer | Source Document | Check |
|---|---|---|
| 1 | LT0019457 /LT0016912 | LT0019592 |
| 2 | LT0019643 /LT0016913 | LT0019608 |
| 3 | LT0019653 /LT0016914 | LT0019611 |
| 4 | LT0019653 /LT0016914 | LT0019612 |
| 5 | LT0019653 /LT0016914 | LT0019610 |

See Pl.'s Exs. 5-72 [ECF No. 67], 5-73 [ECF No. 67], and 6 [ECF No. 81], Adv. Pro. No. 22-03036, for the Bates numbered documents.

The Defendants relied on the rebuttal testimony and expert report of Stephen D. Kirkland to challenge Ms. Collura's findings. On *voir dire*, counsel for the Liquidating Trustee challenged Mr. Kirkland's credentials on the subjects of forensic accounting and cash tracing. *See generally* Day 1 Trial Tr. 173:11-187:13, ECF No. 105 at 173-87. Mr. Kirkland was equivocal regarding his qualifications. Mr. Kirkland admitted that he had more experience in tax and executive compensation matters than he did in cash tracing. *Id*. 173:18-175:11, ECF No. 105 at 174-75. While he had previously employed "flow of funds accounting," Kirkland admitted that he had never specifically utilized "tracing." *Id*. 178:13-21, ECF No. 105 at 178. Mr. Kirkland had never used the LIBR to trace a single source of funds through multiple commingled accounts. *Id*. 178:22-24, ECF No. 105 at 178. And he had never used any of the other commonly accepted tracing methodologies to trace a single source of funds through multiple commingled accounts.[28] *Id*. 179:12-25, ECF No. 105 at 179. Mr. Kirkland insisted that "the only way" to deal with multiple commingled accounts was "to understand the intent of the transaction." *Id*. 179:2-11, ECF No. 105 at 179; *see also id*. at 181:21-22, ECF No. 105 at 181 ("If I can't understand the intent, then I can't account for [a given transfer]."). But Mr. Kirkland failed to identify a single instance in which he had provided expert testimony on tracing where a court had accepted his reliance on the intent of the transferor.[29] *See id*. at 182:17-183:24, ECF No. 105 at 182-83.

---

[28] The other four commonly accepted tracing methodologies are (1) last in, first out ("LIFO"), (2) first in, first out ("FIFO"), (3) the pro rata method, and (4) the Restated Method. *See First United Methodist Church Centre, Ala.*, 2023 WL 7457002, at *5 n.7, 2023 Bankr. LEXIS 2721, at *12 n.7. Mr. Kirkland's equivocal testimony indicated that he may have used LIFO, FIFO, and/or the pro rata method in the past, but only to the extent that he understood the "intent" of the transferor. Day 1 Trial Tr. 179:15-25, ECF No. 105 at 179. For the reasons explained *infra*, the intent of the transferor is irrelevant to a tracing analysis; in fact, the Defendants could not provide, and the Court has not found, any caselaw that relied on the intent of the transferor in the context of these commonly accepted tracing methodologies.

[29] Mr. Kirkland referred to a case titled *David Crowther v. Crowther Roofing & Sheet Metal of Florida* as such an example. But on further questioning by counsel for the Liquidating Trustee, Mr. Kirkland could provide no specific information about what he had provided to the court regarding the intent of the transferor, how he had used such intent to trace funds through commingled accounts, or whether the court had accepted his analysis. The

At the conclusion of the *voir dire*, counsel for the Liquidating Trustee moved to exclude the *Expert Report of Stephen D. Kirkland, CPA, CMC, CFF* [ECF No. 68-1] (the "Kirkland Report") and to disqualify Mr. Kirkland as an expert.  The Liquidating Trustee argued that: (1) Mr. Kirkland was not qualified to be an expert in tracing; (2) the Kirkland Report presented conclusions inadmissible under Rule 702 of the Federal Rules of Evidence; and (3) even if the conclusions were admissible, the Kirkland Report should be excluded because its negligible probative value was substantially outweighed by the danger of wasting time.  *See* Fed. R. Evid. 702 (witness must be qualified by "knowledge, skill, experience, training, or education"); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . wasting time."); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) ("Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" (quoting Fed. R. Evid. 702)); *see Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.*, 785 F.2d 1154, 1159 (4th Cir. 1986) ("Helpfulness is the touchstone of Rule 702." (quoting *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1139 (3d Cir. 1983))).

A trial court has broad discretion to determine whether an expert's report or proposed testimony is reliable or should be excluded.  *See Kumho Tire*, 526 U.S. at 152-53; *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001).  "In assessing the admissibility of expert testimony, a [trial] court assumes a 'gatekeeping role' to ensure that the 'testimony both rests on a reliable foundation and is relevant to the task at hand.'"  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting *Daubert*, 509 U.S.

---

Court could find no reported decision from the case.  This Court did not find Kirkland's testimony about *Crowther Roofing* to be terribly credible.  *See Kumho Tire, Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

at 597).  "The [trial] court's inquiry is a 'flexible one,' whose focus 'must be solely on principles and methodology, not on the conclusions that they generate.'"  *Id.* (quoting *Daubert*, 509 U.S. at 594-95).

The factors the court needs to consider depend "upon the particular circumstances of the particular case at issue." *Kumho Tire*, 526 U.S. at 150.  The Fourth Circuit has held that "in the context of a bench trial, evidence should not be excluded under [Rule] 403" of the Federal Rules of Evidence because the risks posed by exposing a jury to such evidence do not exist when a judge is the trier of fact.  *See Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) ("For a bench trial, we are confident that the [trial] court can hear relevant evidence, weigh its probative value and reject any improper inferences.").  On that basis, and even though Mr. Kirkland's own statements both during *voir dire* and his deposition presented serious questions about his qualifications and ability to apply the commonly accepted tracing methodologies, the Court allowed Mr. Kirkland to testify as an expert in accounting.  *See* Day 1 Trial Tr. 187:17-188:3, ECF No. 105 at 187-88.  In assessing the probative value and reliability of Mr. Kirkland's testimony, the Court considered the appropriate weight it should be accorded.  After hearing the testimony, the Court found Mr. Kirkland's conclusions to be unhelpful, irrelevant, or simply unreliable.

During the Trial, Mr. Kirkland testified that it was simply not possible to trace the Donations that the two churches received to the Avoided Transfers.  Mr. Kirkland's explanation for this conclusion was solely that the Donations came from commingled accounts.  Kirkland Report ¶ 26, ECF No. 68-1 at 7; Day 1 Trial Tr. 190:25-191:6, ECF No. 105 at 190-91.  Mr. Kirkland testified that even if tracing were somehow possible, Ms. Collura did not apply the best tracing method.  Although Kirkland conducted no independent tracing analysis of his own, he claimed the methodologies Ms. Collura employed were unfair to the Defendants because they

resulted in a larger recovery for the Liquidating Trustee than if she had employed an alternative methodology.[30]  Kirkland Report ¶¶ 33-39, ECF No. 68-1 at 8-10.

It is well established that a court may rely upon tracing to identify the proceeds of a fraudulent transaction that are conveyed through multiple commingled accounts.  *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) ("[C]ourts exercise case-specific judgment to select the [tracing] method best suited to achieve a fair and equitable result on the facts before them." (citation omitted)); *Picard v. Charles Ellerin Revocable Tr.* (*In re Bernard L. Madoff Inv. Sec. LLC*), No. 08-01789 (BRL), 2012 WL 892514, at *3 n.7, 2012 Bankr. LEXIS 1088, at *8 n.7 (Bankr. S.D.N.Y. Mar. 14, 2012) ("Courts have broad discretion to determine which monies of comingled funds derive from fraudulent sources." (citations omitted)).

To determine the appropriate tracing methodology, courts consider, among other things, the purpose of the statute under which the movant proceeds, the ultimate result, and the purpose and methodology of the proposed tracing method.  *Cf. In re Maine*, 461 B.R. 723, 731-34 (Bankr. S.D. Ohio 2011).  While the Court has broad discretion in selecting which tracing methodology to employ, its decision, ultimately, is based on the evidence of record. *See, e.g.*, *id.*; *Watts v. MTC Dev., LLC* (*In re Palisades at W. Paces Imaging Ctr., LLC*), 501 B.R. 896, 917-22 (Bankr. N.D. Ga. 2013).  In the cases at bar, the Liquidating Trustee has presented sufficient reliable evidence that traces the Donations received by the Defendants back to HDL.

---

[30]   As this Court has had occasion to note previously,

> [t]he Liquidating Trustee was not obligated to present his case in the light most favorable to Defendant.  Nor does section 550 of the Bankruptcy Code require a plaintiff to present every conceivable method of tracing possible.  The Defendant had access to all of the documents upon which the Liquidating Trustee's expert relied.  If the Defendant believed a different tracing methodology was appropriate, it should have presented its own analysis.

*First United Methodist Church Centre, Ala.* 2023 WL 7457002, at *5, 2023 Bankr. LEXIS 2721, at *12-13.

The LIBR is a well-established and widely accepted method of equitable tracing.  *Off. Comm. of Unsecured Creditors v. Cath. Diocese of Wilmington, Inc.* (*In re Cath. Diocese of Wilmington, Inc.*), 432 B.R. 135, 151 & n.42 (Bankr. D. Del. 2010) (collecting cases); *see In re Maine*, 461 B.R. at 732; *see, e.g.*, *In re Palisades at W. Paces Imaging Ctr., LLC*, 501 B.R. at 917 (using the LIBR in the context of section 550).  The LIBR is a method that has been accepted by the Fourth Circuit and one that this Court has applied in prior cases.

> The Lowest Intermediate Balance Rule originated in trust law as a rule to determine the rights of a trust beneficiary to a trustee's bank account where the trust funds and the trustee's personal funds are commingled.  In this regard, the Rule assumes that the funds at issue remain in the account and are available to be traced provided that the balance does not fall below the amount of the disputed funds.  In the event that "the balance of the account dips below the amount of [funds at issue], [the funds at issue] abate[ ] accordingly."

*United States v. Miller*, 295 F. Supp. 3d 690, 703-04 (E.D. Va. 2018), *aff'd*, 911 F.3d 229 (4th Cir. 2018) (alterations in original) (internal citations omitted);[31] *see also Old Republic Nat'l Title Ins. Co. v. Tyler* (*In re Dameron*), 155 F.3d 718, 723-24 (4th Cir. 1998); *Sony Corp. v. Bank One*, 85 F.3d 131, 139-41 (4th Cir. 1996); *Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Servs.* (*In re LandAmerica Fin. Grp., Inc.*), Nos. 08-03148, 08-03171, 2009 WL 1269578, at *12, 2009 Bankr. LEXIS 4133, at *37-38 (Bankr. E.D. Va. May 7, 2009).  The LIBR assumes that "clean"

---

[31]    The LIBR has roots in English common law as noted by the Supreme Court in the *Cunningham* case:

> The courts below relied on the rule established by the English Court of Appeals in *Knatchbull v. Hallett, L.R.* 13 Ch. D. 696, in which it was decided by Sir George Jessel, Master of the Rolls, and one of his colleagues, that, where a fund was composed partly of a defrauded claimant's money and partly of that of the wrongdoer, it would be presumed that in the fluctuations of the fund it was the wrongdoer's purpose to draw out the money he could legally and honestly use rather than that of the claimant, and that the claimant might identify what remained as his res, and assert his right to it by way of an equitable lien on the whole fund, or a proper pro rata share of it.

*Cunningham v. Brown*, 265 U.S. 1, 12 (1924) (citing *Nat'l Bank v. Ins. Co.*, 104 U.S. 54, 68 (1881); *Hewitt v. Hayes*, 205 Mass. 356, 91 N.E. 332 (1910)).

funds exit the account before the "dirty" funds until the "clean" funds balance is reduced to zero, at which point withdrawals are necessarily made from "dirty" funds. *In re Dameron*, 155 F.3d at 724; *see also Miller v. United States*, 911 F.3d 229, 234-35 (4th Cir. 2018) (affirming district court's finding of probable cause where the government's tracing analysis under the LIBR method showed that the assets were traceable to laundered funds); *see also In re Maine*, 461 B.R. at 733 (applying the LIBR to determine exempt amounts in the debtor's bank account because "withdrawals will be charged first to the non-exempt funds, thus aiding the debtor's fresh start"); *In re Cath. Diocese of Wilmington, Inc.*, 432 B.R. at 151.

To support his conclusion that it is impossible to trace proceeds through multiple commingled accounts, Mr. Kirkland did not refer to any professional texts, treatises, or publications. Counsel for the Defendants did not provide any caselaw or other legal authority in support of Mr. Kirkland's position. Mr. Kirkland explained that because the Collura Report defines "commingling" as "the combination of HDL funds and other sources of funds in the BlueWave and Dent Accounts, such that HDL funds become unidentifiable and/or inseparable," the Donations cannot be traced to HDL. *See* Kirkland Report ¶ 29, ECF No. 68-1 at 8 (quoting Collura Report (CLC) ¶ 16, ECF No. 75 at 7). The Court rejects this conclusory reasoning. It ignores why the application of a tracing methodology is necessary.[32] A tracing methodology, such as the LIBR, can be employed to identify cash proceeds that flow though commingled accounts.

Mr. Kirkland testified that Dent's intent (i.e., for the Donations to have originated from funds Dent claimed he received from Singulex, Inc.[33] ("Singulex") and not from HDL) controlled.

---

[32] Otherwise, the recipient of fraudulently conveyed funds could simply set up multiple comingled accounts through which to wash the tainted funds.

[33] As with HDL, BlueWave was the sales agent and marketing consultant for Singulex. Collura Report (CLC) ¶ 4, ECF No. 75 at 3.

Day 2 Trial Tr. 61:19-62:3, ECF No. 104 at 61-62.  While there was no corroborating evidence that Dent received any payments directly from Singulex, *id*. 45:21-25, 52:24-53:7, ECF No. 104 at 45, 52-53, Dent testified that he believed he obtained approximately $6 million in Singulex funds, *id.* 46:1-4, ECF No. 104 at 46.  Dent testified that, "in [his] mind," he considered the funds he received from Singulex to be his tithing money because it represented roughly ten percent (10%) of the total money that he received from BlueWave.  *See id*. 47:11-15; 48:14-21; 52:11-25, ECF No. 104 at 47, 48, 52.  Dent admitted that he did not have any writing to support this intent, *see id.* 56:3-7, ECF No. 104 at 56, nor did he maintain a separate account to hold the Singulex funds, *id.* 58:21-23, ECF No. 104 at 58.  Dent did not track the use of individual dollars from either HDL or Singulex.  *See id*. 58:21-59:3.

Mr. Kirkland maintained that Dent's intent established that the Defendants did not receive proceeds of the Avoided Transfers.  Kirkland Report ¶¶ 40, 43, ECF No. 68-1 at 10.  Mr. Kirkland noted that the $6 million Dent claimed he received from Singulex was more than the total of the Donations made to the Defendants.  Kirkland Report ¶ 43, ECF No. 68-1 at 10.  Mr. Kirkland concluded, therefore, that the Donations *could* have come entirely out of Singulex funds.  *Id*.  This hypothesis was not the result of Mr. Kirkland's application of any reliable principles or methods of tracing funds.  Rather, it was offered as a possibility, bolstered by Dent's intent.  Day 2 Trial Tr. 36:14-15, ECF No. 104 at 36.

It was Dent who had masterminded the conspiracy to effectuate the fraudulent conveyances from HDL to himself and to BlueWave in the first instance.  A unanimous jury had found Dent liable for 35,074 false claims for services performed by HDL for which Medicare and TRICARE had paid.  *See supra* footnote 8.  The District Court, agreeing with this Court, found that the payment scheme between HDL and Dent violated the False Claims Act.  *Mallory*, 2021 WL

4099012, at *3, 2021 U.S. Dist. LEXIS 170582, at *7-8.  All the money Dent took from HDL was avoided as a fraudulent conveyance.  *Id.* at *4, 2021 U.S. Dist. LEXIS 170582, at *11-12.  In light of the foregoing, this Court found Dent's testimony at Trial—that, in his mind, the donations were supposed to have come from untainted funds in his comingled accounts—to be self-serving and not credible.

Nevertheless, the Fourth Circuit has made clear that the intent of the transferor is irrelevant.  *See Sony Corp.*, 85 F.3d at 138-39 ("We state again that 'dollars are fungible and cannot practically be earmarked in an account.'" (quoting *C. O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 89 Ill. 2d 27, 31, 431 N.E.2d 370, 372 (1982))).  *Sony* dealt with a defendant, Stereo Factory, who attempted to earmark a transfer as originating from a particular source.  *Id.* at 133.  Stereo Factory had given Sony Corporation a purchase money security interest (the "PMSI") in exchange for shipments of inventory.  *Id.* at 134.  Stereo Factory had previously granted First Huntington National Bank (the "Bank"), a blanket lien on all of its personal property.  *Id.*  Under provisions of the Uniform Commercial Code, as adopted by applicable state law, Sony's PMSI held priority over the Bank's blanket security interest.  *Id.* at 138.  Stereo Factory subsequently defaulted on both obligations. *Id.* at 135.

Stereo Factory then sold its Parkersburg operation to a third party for $250,000.  *Id.*  The sales proceeds were deposited into Stereo Factory's commingled operating account at the Bank. *Id.*  Stereo Factory then opened a separate savings account, also pledged to the Bank, into which it transferred approximately $78,000 via check from the operating account into the savings account.  *Id.*  Both the check and the deposit slip clearly stated that Stereo Factory intended for the $78,000 transfer to have come from the $250,000 in sale proceeds.  *Id.*  Sony disagreed.  It argued

that the $78,000 was traceable to Sony's PMSI by application of the LIBR.  *See id*. at 138-39.  The

Fourth Circuit agreed with Sony, holding that

> [o]nce Stereo Factory deposited the $250,000 in its [operating] account, those funds were commingled with the other funds in the account and lost their identity as proceeds from the sale of the Parkersburg operation.  Stereo Factory no longer had the ability to isolate a portion of that $250,000 and transfer those specific funds to its savings account.  The words on the check and deposit slip merely provided useful notes for Stereo Factory's internal recordkeeping.  Those notes, however, did not earmark the transferred funds and do not override the operation of the lowest intermediate balance rule.

*Id*. at 139.  Even when coupled with extrinsic evidence, the intent of the transferor does not matter

when tracing funds.

The holding in *Sony* instructs that Dent's intent, even if it had been established, that the

Donations originated as transfers from Singulex is irrelevant to application of the LIBR.  The

tracing performed by Ms. Collura showed that the Accounts were commingled with funds from

sources other than HDL.  Collura Report (CLC) ¶ 16, ECF No. 75 at 7.  The commingled nature

of the accounts means that each transfer subsequent to the inflow from HDL had lost its identity.

Dent no longer had the ability to isolate a portion of the funds as originating from any given source.

The Defendants have provided no caselaw or other authority in contradiction of *Sony.*

The Parties do not dispute that the Defendants had spent the Donations they had received

from Dent for religious, charitable, and educational purposes.  *See* Joint Stip. ¶ 4, Adv. Pro. No.

22-03020, ECF No. 86 at 2; Joint Stip. ¶ 4, Adv. Pro. No. 22-03036, ECF No. 89 at 3.  This

conclusion is irrelevant to the application of the LIBR.  "Section 550 is concerned with returning

fraudulently transferred property to the estate; it does not consider the potential hardship to, or the

particular circumstances of, a subsequent transferee."  *First United Methodist Church Centre, Ala.*,

2023 WL 7457002, at *9, 2023 Bankr. LEXIS 2721, at *20 (citing *Scholes v. Lehmann*, 56 F.3d

750, 761 (7th Cir. 1995) ("The statute makes no distinction among different kinds of recipient of fraudulent conveyances. Every kind is potentially liable.")). The fact that the Defendants have used the Donations does not eliminate liability.

Taking into consideration the purpose of section 550 of the Bankruptcy Code, the ultimate result in these Adversary Proceedings and these Chapter 11 Cases, the purposes of the tracing method applied by Ms. Collura, and Fourth Circuit precedent, the Court in the exercise of its discretion determined that the Lowest Intermediate Balance Rule was the method best suited to trace the funds in this case. The Court finds that the Liquidating Trustee established through tracing that the Defendants are the mediate transferees of the initial transferees BlueWave and Dent.

## Conclusion

Applying the LIBR, the Court finds that the Liquidating Trustee has proven that Defendant CLC received funds in the amount of $1,149,900 and that Defendant LMBC received funds in the amount of $238,512 that are directly traceable to the Avoided Transfers. The Court also finds that the Charitable Contributions Exception is not a defense assertable by the Defendants in this recovery action under section 550(a) of the Bankruptcy Code. Judgment will be awarded in favor of the Liquidating Trustee against Defendant Christian Life Assembly of Columbia, South Carolina, Inc. in the amount of $1,149,900. Judgment will be awarded in favor of the Liquidating Trustee against Defendant Lake Murray Baptist Church in the amount of $238,512.

Separate Orders shall issue.

Dated: 6/10/24                                  /s/ Kevin R. Huennekens
                                               UNITED STATES BANKRUPTCY JUDGE

                                               Entered on Docket: 6/10/24

**Copies to:**

**Brittany Berlauk Falabella**
**Robert S. Westermann**
Hirschler Fleischer, P.C.
P.O. Box 500
Richmond, VA 23218


**H. Robert Showers**
**J. Vance Stallings**
**J. Caleb Jones**
Simms Showers, LLP
305 Harrison Street, SE
3rd Floor
Leesburg, VA 20175